ALLEGHENY TECHNOLOGIES
INCORPORATED and
ALLEGHENY & TSINGSHAN STAINLESS,
LLC,

          Plaintiffs,

– against –

UNITED STATES,

          Defendant.

Court No. 20-03923

**COMPLAINT**

Plaintiffs Allegheny Technologies Incorporated ("ATI") and Allegheny & Tsingshan Stainless, LLC ("ATS"), by their undersigned attorneys, Chaffetz Lindsey LLP, for their Complaint against Defendant United States, acting by and through the U.S. Department of Commerce, allege as follows:

## NATURE OF THE ACTION

1.      In March 2018, President Trump, acting pursuant to Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. § 1862), imposed a 25% tariff on steel imports. According to the President, the goal of the tariffs was to "help our domestic steel industry to revive idled facilities, open closed mills, preserve necessary skills by hiring new steel workers, and maintain or increase production." Adjusting Imports of Steel into the United States, Pres. Proc. No. 9705, 83 Fed. Reg. 11,625, 11,626 (Mar. 8, 2018).

2.      Recognizing that these tariffs could have unintended consequences, the

Proclamation imposing the tariffs expressly directed the Department of Commerce ("Commerce" or the "Department") to grant exclusions from the tariffs to U.S.-based businesses for imported steel products that are not reasonably available in sufficient quality or quantity in the United States.

3.      According to Commerce, the reason to grant the exclusions was:

> to protect downstream manufacturers that rely on products not produced by U.S. domestic industry at this time. The guiding principle is that, if U.S. domestic industry does not or will not produce a given steel or aluminum product of the quality needed by users in the United States, companies that rely on those products will not pay duties on them.

Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum, 83 Fed. Reg. 46,026, 46,038–39 (Sept. 11, 2018).

4.      Plaintiffs commence this action to challenge the Department's wrongful denials of Plaintiffs' requests for exclusion from the Section 232 tariffs for imports of semi-finished stainless steel slab from Indonesia, and to recover nearly $40 million in tariffs they paid for which the Department should have granted exclusions.

5.      At the time Plaintiffs filed their exclusion requests, ATS produced stainless steel cold-roll coil at its Midland, Pennsylvania facility for use in various commercial applications. In order to maintain its business, ATS required a reliable source of stainless slab, which is the critical feedstock for producing its finished stainless products. Because it could not obtain the necessary stainless slabs in the United States, ATS imported the slab it required.

6.      In February 2018, ATI formed the ATS joint venture to restart an idled cold-rolling facility in Midland, Pennsylvania,- which had been shut down in 2016 due to unfair foreign competition. By reopening the Midland facility, ATS brought the opportunity for hundreds of direct and indirect jobs back to this Pennsylvania community and the surrounding

areas.  Within one month of restarting the Midland facility, President Trump imposed the Section 232 steel tariffs.

7.      At the time Plaintiffs filed their exclusion requests, there were only three other producers of finished stainless products in the United States – AK Steel Corporation, North American Stainless, and Outokumpu Stainless USA LLC.  These companies competed with ATS directly in the market for finished stainless products.  Unlike ATS, however, these companies operated integrated mills where they melted stainless slab and manufactured it into downstream finished stainless products.  In other words, these companies made their own stainless slabs, which they consumed at their own facilities to manufacture the same finished stainless products that ATS manufactured and sold.

8.      Each of these competitors objected to every one of Plaintiffs' requests, claiming they could and would supply all the stainless slab ATS needed.  But that was not true.  As the unrebutted evidence Plaintiffs submitted to the Department demonstrated, the objecting companies could not and would not supply ATS with the stainless slab it required.

9.      The record before the Department established, among other things, that there was no reasonably available domestic stainless slab in the quantity ATS required.  The only domestic companies capable of producing the stainless slabs ATS needed were its direct competitors.  At the time of Plaintiffs' exclusion requests the objectors' steel mills were operating at or near full capacity, and consuming any stainless slab they produced to feed their downstream manufacturing processes.  As a result, these companies simply did not have the excess stainless slab available to meet ATS's requirements.

10.     Moreover, the reality of the stainless steel industry is that the objectors would not sell sufficient amounts of stainless slab to ATS, even if they had excess stainless slab to sell.

Such supply would have enabled ATS to meaningfully compete with them. The market is fiercely competitive – a lost order from one of the four producers is a gain to another. Since the objectors can and do use all of the stainless slab they produce to feed their own downstream manufacturing, supplying stainless slab feedstock to ATS would mean replacing their sales of the more profitable finished stainless products with sales of a less profitable semi-finished slab product. In other words, because these competitors consumed the finite amount of domestic stainless slab feedstock available for the entire domestic market, selling stainless slab to ATS would mean ceding market share in finished stainless products to their direct competitor. For this very reason, there has never been a merchant market for stainless slab in the United States.

11.     Without undertaking any effort to verify the objectors' naked claims, and ignoring the record evidence that there is not, and has never been, reasonably available stainless slab for sale in the domestic market, the Department issued boilerplate decisions denying Plaintiffs' requests. Commerce's decisions lack any analysis or reasoning. They merely parrot the applicable standard and state in conclusory terms that it was not met.

12.     In so doing, the Department of Commerce abandoned the standards established by Proclamation 9705 and its own regulations, thereby depriving Plaintiffs of their rights to due process and fair treatment. In short, the Department's actions were arbitrary, capricious, and an abuse of discretion, in flagrant violation of the Administrative Procedure Act. *See* 5 U.S.C. §§ 701 *et seq.*

13.     The decisions denying Plaintiffs' requests are part of a disturbing pattern in which Commerce has rotely rejected thousands of exclusion requests filed by U.S. companies employing thousands of American workers, providing the same pro forma, conclusory decisions, with no reasoning or analysis.

14.     A recent report by the United States Government Accountability Office (the "GAO") explained the absence of reasoned decisions by Commerce, finding that Commerce did not undertake any analysis in connection with its denials of exclusion requests.  As the GAO expressly found, "Commerce relies solely on the information requesters and objecting parties provide in the forms they file and does not verify the validity of that information."  *See* U.S. Gov't Accountability Office, GAO-20-517, Steel and Aluminum Tariffs:  Commerce Should Improve Its Exclusion Request Process and Economic Impact Reviews (2020) (the "GAO Report"), at 18, *available at* https://www.gao.gov/assets/710/709387.pdf.  In fact, Department officials specifically advised the GAO that "Commerce does not confirm whether . . . a domestic producer [i.e., an objector] can fulfill the quantity it states it is able to provide."  *Id.*  Making decisions without any analysis or weighing of evidence is, by definition, arbitrary and capricious. Commerce simply abdicated its responsibility to grapple with the evidence, as necessary to reach reasoned decisions required by the Administrative Procedure Act.

15.     The history of the Section 232 exclusion process demonstrates, particularly with respect to semi-finished feedstock like slab, that the Department consistently has denied any exclusion request to which large domestic manufacturers, such as AK Steel, object.  The Department ignores record evidence and simply accepts, without analysis or verification, objectors' naked and unsupported claims regarding the amount of semi-finished product they can produce and are willing to sell to their direct competitors to compete with them.

16.     The Department of Commerce's handling of the entire exclusion process is so troubling that, in October 2019, the Department's own Inspector General issued a rare warning to Commerce Secretary Wilbur Ross.  The Inspector General expressed serious concern that irregularities in the process, including apparent undocumented, *ex parte* communications with

objectors, "gives the appearance that Department officials may not be impartial or transparent and are potentially making decisions based on evidence not contained in the official record for specific exclusion requests." *See* Management Alert: Certain Communications by Department Officials Suggest Improper Influence in the Section 232 Exclusion Request Review Process, Final Memorandum No. OIG-20-003-M (Oct. 28, 2019), at 3, *available at* https://www.oig.doc.gov/OIGPublications/OIG-20-003-M.pdf.

17.     In the case of ATS, it is now a matter of public record that at least one objector, AK Steel, had undocumented *ex parte* communications with the Department specifically concerning Plaintiffs' exclusion requests while they were pending. After that communication, Plaintiffs' requests were denied.

18.     Taken together, the GAO and Inspector General reports paint a damning and distressing picture of a tariff exclusion process by which Commerce (i) does not evaluate the truthfulness of objectors' claims; (ii) engages in secret *ex parte* communications with objectors; and (iii) picks winners and losers in the U.S. steel market without weighing the evidence or revealing any factual basis for its decisions.

19.     This mismanagement of the process is in direct contravention of the purpose of the Section 232 steel tariffs and the exclusion process. The goal of the process mandated by the Proclamation was to strengthen domestic steel production and create more U.S. steel jobs. Instead, Commerce's arbitrary denials have served to further consolidate the U.S. steel industry, suppress domestic competition, and kill American jobs. The Department's disregard of its basic obligation to engage in fair, reasoned decision-making mandates reversal.

20.     ATS is a victim of Commerce's failures. As a result of Commerce's wrongful and arbitrary denials of its exclusion requests, ATS has been forced to shut down its

Pennsylvania facility, cease production, and release its employees. All that would not have occurred if Commerce had properly considered the evidence and rendered reasoned decisions based on the facts, as it was legally required to do.

## JURISDICTION

21.    This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(B) and (D) because it concerns claims against the United States or its agencies arising out of laws concerning "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue" and the "administration and enforcement" of such laws.

## THE PARTIES AND STANDING

22.    ATI, headquartered in Pittsburgh, Pennsylvania, is a global manufacturer of technically advanced specialty materials and complex components. Its products support diverse markets and industries such as aerospace and defense, oil & gas, electrical energy, medical, automotive, and other industrial markets. ATI employs over 5,400 people in the United States. Insofar as is pertinent here, ATI filed the exclusion requests on behalf of ATS, benefitted from the critical role it played in ATS's production process, and joined in the requests, which sought relief, in part, based on the impact the tariffs had on ATI's business.

23.    ATS is a joint venture formed in February 2018 between ATI and Tsingshan Group. Its purpose was to manufacture and sell finished stainless products, for use in various commercial applications. The joint venture invested more than $90 million to reopen the cold-rolling facility in Midland, Pennsylvania, which ATI was previously forced to close in 2016 due to unfairly traded imports. ATS produced its finished stainless products using stainless slab sourced from an affiliated mill in Indonesia, hot-rolling services sourced from ATI's

Brackenridge, Pennsylvania, facility, and final cold-rolling services sourced from ATS's Midland, Pennsylvania facility. Lacking 232 tariff relief and a viable source of domestic stainless slabs, ATS was forced to shut down the Midland facility and cease operations in mid-2020.

24. Plaintiffs have standing to bring this action because they have been adversely affected or aggrieved by agency action within the meaning of Section 702 of Title 5 of the United States Code, namely the Department of Commerce's wrongful denials of their requests for exclusion from Section 232 steel tariffs. 28 U.S.C. § 2631(i); 5 U.S.C. § 702.

25. Defendant is the United States of America, acting by and through the U.S. Department of Commerce.

## FACTUAL BACKGROUND

### A. Statutory and Regulatory Background

26. Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. § 1862), authorizes the Secretary of Commerce, in coordination with the Secretary of Defense, to conduct an investigation "to determine the effects on the national security of imports" of any articles. Upon completing this investigation, the Secretary must provide the President with a report advising whether the articles under investigation are "being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security." 19 U.S.C. § 1862(b)(1)(A), (3)(A).

27. If the President concurs with the Secretary's finding that a threat exists, the President shall "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." *Id.* § 1862(c)(1)(A)(ii).

28.     Pursuant to Section 232, on March 8, 2018, President Trump issued Proclamation 9705, imposing additional duties on imports of steel.  The Proclamation directed the Secretary of Commerce to grant exclusions from these tariffs if the Secretary determines that any steel product for which an exclusion is requested is not "produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality" or should be excluded "based upon specific national security considerations."  Adjusting Imports of Steel into the United States, Pres. Proc. No. 9705, 83 Fed. Reg. 11,625, 11,627 (Mar. 8, 2018).

29.     On March 19, 2018, the Department of Commerce, through its Bureau of Industry and Security ("BIS"), issued an interim final rule (codified at 15 C.F.R. pt. 705, supp. 1) setting forth the circumstances in which the Department would grant a tariff exclusion to directly affected U.S. businesses.  Following a notice and comment period, on September 11, 2018 the Secretary supplemented the rule for tariff exclusion requests.  *See* Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum, 83 Fed. Reg. 46,026 (Sept. 11, 2018).

30.     The Rule adopted by the Department of Commerce sets forth the procedures for affected parties to request tariff exclusions.  It also provides that a domestic producer may object to any such request if that producer is capable of "immediately" providing the product to the requester in the United States in a sufficient and reasonably available amount.

31.     The Department's Rule specifies that a product is "not produced in the United States in a sufficient and reasonably available amount" if:

> the amount of steel that is needed by the end user requesting the exclusion is not available immediately in the United States to meet its specified business activities.  "Immediately" means whether the product is currently being produced or could be produced "within eight weeks" in the amount needed in the business activities of the user of steel in the United States described in the exclusion request.

15 C.F.R. pt. 705, supp. 1(c)(6)(i).

32. The Department's Rule plainly and sensibly places the burden on an objector to demonstrate that it can and will supply the requester with the covered product within the requisite timeframe:

> The objection should clearly identify, and provide support for, its opposition to the proposed exclusion, with reference to the specific basis identified in, and the support provided for, the submitted exclusion request. If the objector is asserting that it is not currently producing the steel identified in an exclusion request but can produce the steel within eight weeks (meaning the objector meets the definition of being able to supply the steel "immediately" in order to meet the demand identified in the exclusion request), the objector must identify how it will be able to produce the article within eight weeks. This requirement includes specifying in writing to the U.S. Department of Commerce as part of the objection, the timeline the objector anticipates in order to start or restart production of the steel included in the exclusion request to which it is objecting.

*Id.* pt. 705, supp. 1(d)(4).

33. The Rule also explains the national security criterion, as follows:

> [I]f the steel included in an exclusion request is needed by a U.S. defense contractor for making critical items for use in a military weapons platform for the U.S. Department of Defense, and the duty or quantitative limitation will prevent the military weapons platform from being produced, the exclusion will likely be granted. The U.S. Department of Commerce, in consultation with the other parts of the U.S. Government as warranted, can consider other impacts to U.S. national security that may result from not approving an exclusion, e.g., the unintended impacts that may occur in other downstream industries using steel, but in such cases the demonstrated concern with U.S. national security would need to be tangible and clearly explained and ultimately determined by the U.S. Government.

*Id.* pt. 705, supp. 1(c)(6)(iii).

34. In the process of finalizing the Rule, the Department assured interested parties that it would engage in a fair and reasoned decision-making process:

> *[T]he Department wants to emphasize that BIS and ITA do not*

> *prejudge or give greater weight to any particular submission, whether an exclusion request, an objection, a rebuttal, or a surrebuttal.* The process is created to allow each party involved in the process to provide relevant information, including that specified on the forms by the Department, and any other information that the party involved in the process believes is relevant, in order to allow the Department to make a fair, impartial and consistent determination whether an exclusion request should be approved or denied.

83 Fed. Reg. 46,026, 46,038 (emphasis added). Unfortunately, as explained below, the Department failed to adhere to its own standards and guidelines.

### B.    ATS's Flat-Rolled Stainless Steel Business and the United States Market

35.    In the face of repeated dumping and subsidized imports, ATI was forced in 2016 to close its Midland, Pennsylvania facility.

36.    Both before and after the closure of its Midland facility, ATI explored multiple options with different companies in an effort to maintain the operations. In late February 2018, after months of meetings and negotiations, ATI and Tsingshan Group formed ATS. The companies invested heavily in reopening the Midland cold-rolling facility so that ATS could manufacture and sell finished stainless products in the United States.

37.    ATS operated its business by: (i) purchasing stainless slab from an affiliated Indonesian mill; (ii) contracting with ATI to roll the stainless slab into hot-roll coil in Brackenridge, Pennsylvania; and (iii) cold-rolling the hot-rolled coil into finished stainless products at its Midland facility. By re-opening the Midland facility, ATS was able to directly employ up to 100 American workers, and support hundreds of additional jobs in the surrounding communities that serviced the Midland facility.

38.    ATS's direct competitors for the sale of finished stainless products in the U.S. are AK Steel Corporation ("AK Steel"), North American Stainless ("NAS") and Outokumpu

Stainless USA LLC ("OTK"). These competitors are also the only domestic manufacturers of stainless slab required for ATS's operations. ATI lacks the ability to produce "60-inch wide" stainless slab and it did not have the effective capacity to produce "48-inch wide" slab ATS required.[1]

39.     AK Steel, NAS, and OTK each operate vertically-integrated mills where they make stainless slab to feed their downstream production. U.S. stainless slab producers have never sold stainless slab in any meaningful quantities, and consequently no stainless slab market has ever developed. Rather, they have always captively consumed any stainless slab they produce in order to manufacture the more profitable downstream finished stainless products. Selling stainless slab to a competitor would necessarily involve reducing the company's own feedstock, which in turn would limit its output of finished stainless product, reduce its market share, and lower its profits. These competitors, therefore, had no incentive to supply stainless slabs to help ATS.

40.     ATS's restarting of the Midland facility in February 2018 faced immediate headwinds. Only a month later the whole operation was threatened by the President Trump's enactment of the Section 232 tariffs. However, the exclusion process seemed to provide a lifeline, as the ATS Midland operation – a U.S. business with no reasonably available domestic supply of stainless slab feedstock – was a prime candidate to be granted exclusions.

**C.     Plaintiffs' Requests for Exclusion from Section 232 Tariffs**

41.     On April 9, 2018, Plaintiffs filed a request for exclusion from the Section 232

---

[1] The terms "60-inch wide" and "48-inch wide" stainless slab are terms of art used in the industry that denote the width of the final product manufactured using the stainless slab. While these grades vary in chemical composition and dimension (in order to address yield loss during final product manufacturing), they were all able to be hot-rolled and then cold-rolled by ATI into 60-inch and 48-inch finished stainless products.

tariff for 300,000 tons of 60-inch wide commodity grade stainless slab.  On April 13, 2018,

Plaintiffs filed an additional request for exclusion from the Section 232 tariff for 36,000 tons of

48-inch wide commodity grade stainless slab.  In support of their exclusion requests, Plaintiffs

demonstrated that (i) stainless slab was "not produced in the United States in a sufficient and

reasonably available amount" and (ii) ATI's unique position as a major supplier to the United

States defense sector and other critical industries further warranted exclusion on national security

grounds.  The Department posted the requests for review under Docket Numbers BIS-2018-

0006-0326 and BIS-2018-0006-0889.

### 1.     The Department Wrongfully Denies Plaintiffs' Exclusion Requests

42.     After the Department posted the exclusion requests, three competitors, AK Steel,

NAS, and OTK, filed objections.  Without support, the objectors claimed that they could and

would supply all the stainless slab ATS required, although in fact they had never supplied or

been called upon to supply any stainless slab to any company in the past.  Plaintiffs pointed that

out to the Department and demonstrated that the objectors could not and would not provide the

stainless slab ATS required to manufacture directly competing finished stainless products.

Plaintiffs further demonstrated that specific national security concerns existed and that factor

also warranted exclusions from the tariffs.

43.     Faced with this evidence, if it had fairly weighed, assessed, and considered the

history and the facts, the Department would have properly concluded that Plaintiffs were entitled

to their requested exclusions.  Not doing so, the Department ruled precisely the opposite.

### a.     The stainless slab ATS imported was not available in the United States

44.     The stainless slab ATS required was not "reasonably available" from domestic

sources for two basic reasons:  (i) none of the objectors had sufficient excess stainless slab

capacity to sell; and (ii) these companies had no interest in selling their direct competitor the stainless slab it required.

### i. There was no excess capacity of stainless slab in the domestic market

45.     Because of the vertically-integrated nature of the objectors' flat-rolled stainless steel business, they had little to no excess capacity to sell to ATS.  The undisputed evidence ATS submitted, including reports from steel industry analysts, proved that the objectors' stainless slab melt shops were operating in excess of 90% capacity.  This was well above the target utilization rate identified by the Secretary of Commerce in the Section 232 Report, which found that "[u]tilization rates of 80 percent or greater are necessary to sustain adequate profitability and continued capital investment, research and development, and workforce enhancement in the steel sector."  *See* U.S. Department of Commerce, Bureau of Industry and Security, Office of Technology Evaluation, "The Effect of Imports of Steel on the National Security; An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended," at 4 (January 11, 2018), *available at* https://www.commerce.gov/sites/default/files/the_effect_of_imports_of_steel_on_the_national_security_-_with_redactions_-_20180111.pdf.

46.     The lack of a domestic market for stainless slab was also supported by Plaintiffs' evidence demonstrating that:  (i) none of the objectors included stainless slab in their published product offerings; (ii) the top steel industry publications, like American Metals Market (n/k/a Fastmarkets) and CRU, did not even publish U.S. market pricing for stainless slab because none was ever available; and (iii) trade statistics compiled by the American Iron and Steel Institute showed that there had been no shipments of stainless slab in the United States.  Simply put, the uncontroverted record was that there was no market for stainless slab in the U.S., and never had

been. The only producers of stainless slab captively consumed it at their integrated mills to support their own rolling of higher margin, finished stainless products.

47. Despite these facts, AK Steel, NAS, and OTK each stated that they (i) produced the stainless slabs that ATS sought to import and (ii) had the capacity available to sell ATS all the stainless slab it needed. The objectors failed to furnish any evidence that they had the capacity, let alone the intent to supply ATS, and Commerce never required such evidence. Indeed, Commerce ignored the evidence before it that these companies simply lacked the capacity to sell stainless slab to ATS.

48. OTK admitted that, at the time of the requests, it was running near full capacity, and could supply no more than 5,000 tons per month, a de minimis amount of the 300,000 tons of slab ATS required. Moreover, OTK stated that in order to produce even that small amount, it would take a $2 million capital investment and at least 180 days for it to produce stainless slab meeting ATS's specifications.

49. NAS's effective slab melting capacity was operating at near 100%, and it therefore had no capacity to supply ATS slab. In fact, the CFO of Acerinox, S.A., NAS's parent company, publicly acknowledged that the company was "running at full capacity" in the United States and frankly stated, "the level of capacity utilization is so big in America that [selling slab on the domestic market] is not a possibility that [NAS was] contemplating."

50. Finally, although AK Steel had facilities capable of making the stainless slab ATS required, those facilities were operating at or near full capacity making carbon steel slab. In order to supply ATS, AK Steel would have had to replace its near-capacity carbon steel product with stainless slab to provide to ATS. AK Steel did not provide any evidence that it was willing or able to do so, or that it could do so "immediately" (i.e., within 8 weeks), as required by the

Department's Rule.

<strong>ii.    None of the objectors was willing to sell slab to ATS's competing operation</strong>

51.     The Plaintiffs also demonstrated that, even if the objectors had sufficient excess capacity to supply stainless slab to ATS (and they did not), they had no incentive to do so. Given their high utilization rates and the fiercely competitive market for downstream finished stainless products, each ton of stainless slab the objectors supplied to ATS would mean a ton-for-ton reduction in their own finished stainless product output.  In other words, selling semi-finished slab feedstock to ATS would require the objectors to limit their own production of more profitable finished stainless products, and cede the market share to their competitor.

52.     This market reality was confirmed when, in response to ATS's exclusion requests, AK Steel offered to sell some stainless slab at a price higher than the then-current market price for the finished stainless product.  This sham offer provided further evidentiary support that there simply was no market for stainless slab, and no domestic supply of stainless slab was "reasonably available" to ATS.

53.     Despite all the evidence that the objectors lacked (i) sufficient spare stainless slab capacity to both provide ATS slab and support their own slab requirements and (ii) the incentive to provide feedstock to ATS at the expense of limiting their own downstream production, Commerce turned a blind eye.  It ignored the fact that if the exclusions were denied, ATS would have to either pay the tariffs to import stainless slab and go out of business, or have no stainless slabs and go out of business.  This record compelled only one rational conclusion – no domestic stainless slab was reasonably available to ATS, and the exclusions should have been granted.

<strong>b.    The requested exclusions were warranted based on specific national security considerations</strong>

54.     Plaintiffs also demonstrated that ATS required a reliable and sufficient supply of

stainless slab to support the long-term financial health of ATI.  ATI is one of only a handful of suppliers of unique metals and components for aerospace, energy, infrastructure, and biomedical applications, critical to the national security of the United States.  A significant volume change in one part of ATI's portfolio (such as a reduction in use of its hot-rolling facility to process ATS's stainless slab) disrupts its cost structure and other product offerings.

55.    In 2015, ATI opened its new $1.2 billion hot-rolling facility in Brackenridge, Pennsylvania.  This hot-rolling facility is the most powerful mill of its kind in the world and is the hub of ATI's flat-rolled products business.  In order to absorb the fixed costs of such a facility, sufficient volume is critical and the volume of hot rolling generated by the ATS business was to be a significant driver.  Had ATS received the exclusions and not been forced to shutter its Midland facility, the baseline capacity utilization of ATI's hot-rolling facility would have ultimately increase by about 50%.  Plaintiffs clearly made this point in their requests.

56.    Exclusions from the Section 232 tariffs were thus critical to increasing utilization of ATI's hot-rolling facility to process ATS's slab, which, in turn, would bolster the financial stability of all of ATI's operations by helping to absorb the fixed costs of operating its facilities. This, in turn, supported ATI's manufacture and supply of certain alloys and components critical to national defense.

### 2.    The Department's Boilerplate Denials of ATS's Exclusion Requests

57.    According to the Department's regulations, it should have decided each exclusion request no later than 106 days after submission.  15 C.F.R. pt. 705, supp. 1(h)(3)(i). Nevertheless, the Department took over a year to deny Plaintiffs' requests.  When it finally issued its decisions, the Department simply recited boilerplate language, citing no record evidence and providing no reasoning whatsoever to support its conclusions.

58.    The Department's denials stated the following generic, conclusory language as

the only basis for its decisions:

> In examining whether the relevant steel article is produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality, ITA [International Trade Administration] recommends finding, based on all of the evidence presented, that the product referenced in the above-captioned exclusion request is produced in the United States in a sufficient and reasonably available amount and of a satisfactory quality, and recommends denying the request for an exclusion.

> BIS accepts ITA's recommended findings as to the domestic availability of the product, and finds that no overriding national security concerns require that this exclusion request be granted notwithstanding the domestic availability.

59. These rote, unreasoned denials of Plaintiffs' exclusion requests without any explanation or any reference to or consideration of the evidence are, on their face, arbitrary and capricious.

60. Notably, and disturbingly, the Department's decisions denying Plaintiffs' requests are part of a broader pattern in which the Department has rejected thousands of exclusion requests by providing the same pro forma, conclusory explanation, with no reasoning or analysis. One common denominator in all these cases is that large domestic competitors such as AK Steel (along with carbon steel producers Nucor and U.S. Steel) filed objections to the requests. In fact, according to a study conducted by the Mercatus Center at George Mason University, Commerce denied approximately 99% of steel tariff exclusion requests when these companies filed an objection. *See* Christine McDaniel & Danielle Parks, Tariff Exclusion Requests: A One-Year Update, Mercatus Center (Apr. 11, 2019), www.mercatus.org/bridge/commentary/tariff-exclusion-requests-one-year-update, attached hereto as **Exhibit 1**.

61. The Department's failure to provide any analysis is unsurprising in light of the GAO's revelation that Commerce did not conduct any analysis or undertake any effort to verify objectors' claims that they could or would produce the products for which exclusions were

sought. GAO Report at 18 ("Commerce relies solely on the information requesters and objecting parties provide in the forms they file and does not verify the validity of that information [and] does not confirm whether . . . a domestic producer [i.e., an objector] can fulfil the quantity it states it is able to provide."). The Department also confirmed to the GAO that despite the plain wording of the Proclamation and the purpose of the Section 232, it has never actually used the national security criterion to determine an exclusion request. *Id.* This was evidently the case with Plaintiffs' requests.

62. The pattern that has emerged is also troubling for another reason: the Inspector General's report identifying improper influences in the process and the appearance of impropriety presented by the Department's conduct.

63. Indeed, as noted, in the case of ATS, it is now a matter of public record that at least AK Steel had *ex parte* communications with the Department specifically concerning ATS's exclusion requests while the requests were pending before the Department. For example, AK Steel CEO Roger Newport arranged a call with Secretary of Commerce Wilbur Ross to "discuss the ATI-Tsingshan stainless steel slab exclusion request and the impact it could have on the stainless steel market in the U.S." *See NLMK Indiana et al. v. United States*, Case No. 1:20-cv-00050-CRK, Dkt. 49-2 (Ct. Int'l Trade Sept. 15, 2020), at NLMK Supp. AR 498–500. These kinds of secret meetings and communications, leading to inexplicable decisions, puts in question the entire Section 232 process conducted by Commerce.

64. The GAO Report, the Inspector General's observations, the *ex parte* communications brought to light thus far, and the conclusory denials of Plaintiffs' requests strongly corroborate what is evident from the record – the Department's decisions were not based on any reasoned analysis of the actual record evidence regarding the exclusion requests.

## COUNT I
**(Administrative Procedure Act (5 U.S.C. §§ 701–706))**
**(Wrongful denial of Request No. 0326)**

65.     Plaintiffs hereby incorporate Paragraphs 1–64 above as if fully restated herein.

66.     On April 9, 2018, Plaintiffs filed a request seeking exclusion from the Section 232 steel tariffs for 60-inch wide stainless slab imported from Indonesia for use at ATS's Midland, Pennsylvania facility.

67.     Applying the standards set forth in the Department's Rule (15 C.F.R. pt. 705, supp. 1) to the evidence in the record, the only reasonable conclusion that the Department could properly have reached with regard to this exclusion request was that ATS could not obtain "reasonably available" stainless slab in the U.S. market in a sufficient quantity to meet its requirements.  Accordingly, Plaintiffs were, and remain, entitled to the requested tariff exclusion. However, on April 19, 2019, the Department denied the request.

68.     The Department of Commerce's decision denying Plaintiffs' request for exclusion from the Section 232 steel tariffs, without any analysis or expressed, reasoned basis for doing so, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  It was rendered "without observance of procedure required by law," and thus must be held "unlawful and set aside" by this Court.  *See* 5 U.S.C. §§ 702, 706.

## COUNT II
**(Administrative Procedure Act (5 U.S.C. §§ 701–706))**
**(Wrongful denial of Request No. 0889)**

69.     Plaintiffs hereby incorporate Paragraphs 1–64 above as if fully restated herein.

70.     On April 13, 2018, Plaintiffs filed a request seeking exclusion from the Section 232 steel tariffs for 48-inch wide stainless slab imported from Indonesia for use at ATS's Midland, Pennsylvania facility.

71.     Applying the standards set forth in the Department's Rule (15 C.F.R. pt. 705, supp. 1) to the evidence in the record, the only reasonable conclusion that the Department could properly have reached with regard to this exclusion request was that ATS could not obtain "reasonably available" stainless slab in the U.S. market in a sufficient quantity to meet its requirements.  Accordingly, Plaintiffs were, and remain, entitled to the requested tariff exclusion. However, on April 19, 2019, the Department denied the request.

72.     The Department of Commerce's decision denying Plaintiffs' request for exclusion from the Section 232 steel tariffs, without any analysis or expressed, reasoned basis for doing so, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  It was rendered "without observance of procedure required by law," and thus must be held "unlawful and set aside" by this Court.  *See* 5 U.S.C. §§ 702, 706.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment as follows:

(i)     Declaring that the Department of Commerce's denials of Plaintiffs' exclusion requests were arbitrary and capricious or otherwise unlawful in violation of the APA (5 U.S.C. §§ 701 *et seq.*);

(ii)    Declaring that Plaintiffs were entitled to the requested exclusions from the Section 232 steel tariffs, in accordance with Proclamation 9705 and 15 C.F.R. pt. 705, supp. 1, and ordering the Department of Commerce to instruct Customs and Border Patrol to refund the Section 232 tariffs previously paid by Plaintiffs;

(iii)   Alternatively, remanding the matter to the Department of Commerce for proper treatment and consideration, in accordance with the requirements of the APA;

(iv)    Awarding Plaintiffs such other relief as the Court deems just and proper.

Dated: New York, New York
      December 21, 2020

Respectfully submitted:

**CHAFFETZ LINDSEY LLP**

By: _____/s/ Sanford Litvack_____

Sanford Litvack
Andrew L. Poplinger
Gerard Bifulco
1700 Broadway, 33rd Floor
New York, NY 10019
Tel. (212) 257-6960
Fax. (212) 257-6950
s.litvack@chaffetzlindsey.com
a.poplinger@chaffetzlindsey.com
g.bifulco@chaffetzlindsey.com

*Counsel for Plaintiffs Allegheny*
*Technologies Incorporated and*
*Allegheny & Tsingshan Stainless, LLC*